## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. :   11-cr-00362-WYD

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**1.**    **DALE JOHNSON**

     Defendant.

---

### MOTION FOR NON GUIDELINE STATUTORY SENTENCE

---

Defendant, Dale Johnson, by counsel, pursuant to 18 U.S.C. § 3553(a), moves the Court for a variance, or non guideline statutory sentence and requests the Court grant him probation and in support thereof states as follows:

### LEGAL ANALYSIS

The United States Sentencing Guidelines are advisory only. *Kimbrough v. United States,* 552 U.S. 85, 90-91 (2007).  The key to sentencing is reasonableness. *See Gall v. United States,* 552 U.S. 38, 46 (2007).  Under the "parsimony principle" the overriding determination is for the district court to craft a sentence that is "sufficient but not greater than necessary to comply with the purposes of criminal punishment" under 18 U.S.C. § 3553(a).  *United States v. Martinez-Barragan,* 545 F.3d 894, 904-05 (10th Cir. 2008).

Nor is a mathematical approach to sentencing acceptable:

> The mathematical approach also suffers from infirmities of application. On one side of the equation, deviations from the Guidelines range will always appear more extreme--in percentage terms--when the range itself is low, and a sentence of probation will always be a 100%

1

> departure regardless of whether the Guidelines range is 1 month or 100 years. Moreover, quantifying the variance as a certain percentage of the maximum, minimum, or median prison sentence recommended by the Guidelines gives no weight to the "substantial restriction of freedom" involved in a term of supervised release or probation.

*Gall, supra* at 47-48.  In *Gall's* case, the Supreme Court upheld a sentence of probation even though his guidelines calculation was 30 to 37 months.  *Id.* at 43.

The guidelines reflect a rough approximation of sentences that might achieve the objectives of § 3553(a).  *Rita v. United States,* 551 U.S. 338, 350 (2007).  And the sentencing court may take into consideration that the guidelines should not apply at all "because the Guideline sentence itself fails properly to reflect § 3553(a) considerations."  *Id.* at 351.  Moreover, this Court may rely on factors disfavored by the guidelines.  *Gall, supra* at 59*; United States v Munoz-Nava,* 524 F.3d 1137, 1148 (10th Cir. 2008).

In determining a defendant's sentence, this Court is directed first to consider the advisory guideline range in deciding upon an appropriate sentence, and the range must be calculated correctly.  *Gall, supra* at 49-50; *United States v. Munoz-Nava,* 524 F.3d 1137, 1146 (10th Cir. 2008).  Next the Court must consider the factors in 18 U.S.C. § 3553(a).  *Id.*  This includes imposition of a sentence sufficient but not greater than necessary to accomplish the goals of sentencing after considering:  (1) the nature of the offense and the history and characteristics of the defendant under § 3553(a)(1); (2) the need to provide just punishment under § 3553(a)(2)(A); (3) the need to afford adequate deterrence under § 3553(a)(2)(B); (4) the need to protect the public from further crimes under § 3553(a)(2)(C); and (5) the need to provide the defendant with adequate medical care, or other correctional treatment under § 3553(a)(2)(D).

Other statutory sections give the district court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the limitation that the judge is required to recognize that imprisonment is *not* an appropriate means of promoting correction and rehabilitation. Under 18 U.S.C. § 3661 there is no limitation to be placed on the information concerning the background, character, and conduct of a defendant which a court may receive and consider for the purpose of imposing sentence.

This Court is free to apply any sentence that is "reasonable." *United States v. Smart,* 518 F.3d 800, 803 (10th Cir. 2008). Reasonableness is not judged by the mathematical precision in calculating the guidelines. *Id.* at 807. And there is no requirement to present "extraordinary" facts to support a variance. *Id.*

*Gall* and *Kimbrough* end the practice of permitting variances only in extraordinary circumstances. *Smart, supra* at 808. And, even though the Probation Department consistently recommends within guidelines sentences, there should be no expectation of a Guideline sentence under current law. *See Irizarry v. United States,* 553 U.S. 708, 713-14 (2008). The Tenth Circuit has upheld a sentence of one year and one day, one year of home confinement and five years of supervised release, where the defendant was convicted of possession with intent to distribute 100 grams of heroin with a guideline range of 46-57 months. *See Munoz-Nava, supra* at 1149. The Tenth Circuit has also upheld a sentence of 240 months for a defendant who was involved with a methamphetamine ring despite a guideline range of 324-405 months. *United States v. Mendoza,* 543 F.3d 1186 (10th Cir. 2008).

3

Some sections of the United States Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Rita*, 128 S.Ct. at 594; *see also United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring).  But, the Supreme Court also recognizes that "not all of the Guidelines are tied to this empirical evidence".  *Rita*, 128 S.Ct. at 594 n.2

A sentencing court has the discretion to reject the guidelines.  A Court's rejection of the guidelines based on its disagreement with congressional policy is particularly well-grounded when the Guideline in question is not the result of the Sentencing Commission's empirical work and expert analysis, but is instead the result of statutory mandatory minima or other congressional directives. *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 550, 169 L.Ed.2d 481 (2007)

The fraud guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of culpability, low risk of recidivism, need to make restitution, or collateral punishment; (3) would result in unwarranted disparity as compared with sentences for similarly situated defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.  "While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011); see also

4

United States v. Ovid, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he

fraud guideline, despite its excessive complexity, still does not account for many of the

myriad factors that are properly considered in fashioning just sentences, and indeed no

workable guideline could ever do so.").

A substantial variance is needed in this case because of the following mitigating

factors, all of which are highly relevant to the purposes of sentencing and none of which

is taken into account by the guideline range.

When Congress enacted the Sentencing Reform Act of 1984, it directed the

Commission to promulgate guidelines that "assure the meeting of the purposes of

sentencing," 28 U.S.C. §991(b)(1)(A), and to use average sentences imposed and

prison time actually served in the pre guidelines period as a "starting point." 28 U.S.C. §

994(m).  The Commission was then to continually review and revise the guidelines in

light of sentencing data, criminological research, and consultation with frontline actors in

the criminal justice system. See 28 U.S.C. §991(b)(1)(C), § 991(b)(2), § 994(o), §

995(13), (15), (16).  The original Commissioners abandoned the effort to design the

guidelines based on the purposes of sentencing because they could not agree on which

purposes should predominate, and instead purportedly based the guidelines on an

empirical study of time served for various offenses before the guidelines. See USSG,

Ch. 1 Pt. A(3); Justice Stephen Breyer, The Federal Sentencing Guidelines and the Key

Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States, 551 U.S. 338 (2007)*, the Supreme Court gave two

reasons that it may be "fair to assume" that the guidelines "reflect a rough

approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the

5

original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. Id. at 348-50. The Court recognized, however, that not all guidelines were developed in this manner. See *Gall v. United States, 552 U.S. 38, 46 & n.2 (2007); Kimbrough v. United States, 552 U.S.85, 96 (2007)*. When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Id. at 109-10.

The fraud guideline is not based on empirical data of past practice or on national experience. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. See *Spears v. United States, 129 S. Ct. 840, 843 (2009); Kimbrough, 552 U.S. 101-02, 109-10; Rita, 551 U.S. at 351, 357*.

Before the guidelines, first offenders convicted of sophisticated embezzlement involving the highest loss amounts who were sentenced to prison served, on average, 30-37 months, and 1% of such defendants received probation. See U.S. Sent'g Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 30 (1987),

http://www.src-project.org/wpcontent/pdfs/reports/USSC_SupplementaryReport.pdf.
First offenders convicted of sophisticated fraud involving the highest loss amounts who
were sentenced to prison served, on average, a prison sentence of 18-24 months, and
18% of such defendants received probation. Id.at 33.

When the Commission adopted the original guidelines in 1987, it "decided to
abandon the touchstone of prior past practice" with respect to white collar offenses.
Breyer, supra, 17Hofstra L. Rev. at 22-23.  The Commission required some form of
confinement for all but the least serious cases, and adopted a fraud guideline requiring
no less than 0-6 months and no more than 30-37 months for defendants in Criminal
History Category I. See USSG § 2F1.1 (1987).

The Commission explained that "the definite prospect of prison, though the term
is short, will act as a significant deterrent to many of these crimes, particularly when
compared with the status quo where probation, not prison, is the norm." USSG, ch. 1,
intro., pt. 4(d) (1987); see also U.S. Sent'g Comm'n, Fifteen Years of Guidelines
Sentencing: An Assessment of How Well theFederal Criminal Justice System is
Achieving the Goals of Sentencing Reform 56 (2004) [hereinafter Fifteen Year Report]
(Commission sought to ensure that white collar offenders faced "short but definite
period[s] of confinement").

The Commission's deterrence rationale was not based on empirical evidence.
The empirical research regarding white collar offenders shows no difference between
the deterrent effect of probation and that of imprisonment. See David Weisburd et al.,
Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33
Criminology 587 (1995).  "[T]here is no decisive evidence to support the conclusion that

harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8Cardozo J. Conflict Resol. 421, 448-49 (2007).  Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences.

Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased.  In 1989, two years after the guidelines went into effect, three levels were added for a loss amount of $2,500,000.00. See USSG, App. C, Amend. 99 (Nov. 1, 1989).  As the official reason for the amendment, the Commission stated only that it sought to "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." Id. This reason was soon refuted.

According to former Commissioner Michael K. Block (who had just resigned for what he said was a lack of commitment by commissioners to base decisions on research and scientific data when amending sentencing guidelines, Paula Yost, *Sentencing Panel Member Resigns over Research,* Wash. Post, August 23, 1985, at A25.) and former Deputy Chief Counsel Jeffrey S. Parker, the Justice Department's ex-officio member of the Commission had persuaded four of six  Commissioners "that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties," when the statutes "said no such thing." Jeffery S. Parker & Michael K. Block, The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset, 27 Am. Crim. L. Rev. 289, 319 (1989).  The Commission "gratuitously" increased punishment for larger fraud cases for reasons that were "overtly political and

inexpert," and abandoned its statutory mandates by failing to rely on its own data, failing to measure the effectiveness or efficiency of guideline sentences, and failing to provide analysis of prison impact. Id. at 318-20.

In 2001, the penalties were increased again as part of the Commission's Economic Crimes Package. See USSG, App. C, Amend. 617 (Nov. 1, 2001).  As the official reason for this amendment, the Commission stated that it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." Id. While the Commission did not identify the "other guidelines" to which it referred, it is clear from the proceedings upon which the amendment was based that it referred to the drug guidelines.  It should also be noted that one of the purposes of the amendment was to promote the payment of restitution.

At the Commission's Economic Crimes Symposium in 2000, at which the issues and questions underlying the Economic Crimes Package were discussed by judges, stakeholders, and academics over a two-day period, a formal question was posed and provided in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses 54 (2000) [hereinafter Economic Crimes Symposium].

www.ussc.gov/Research_and_Statistics/Research_Projects/Economic_Crimes/200010
12_Symposium/xPlenaryVIII.PDF

Speaking on behalf of the Department of Justice, and in response to the

moderator's question asking whether economic crimes should be "punished in the same

way that we punish drug offenders," id. at 55, Assistant Attorney General James K.

Robinson stated that "sentences for economic crimes should not be set, in our view, to

match sentences for drug crimes," id. At 59, but should be set "in terms of the need to

fulfill the purposes of sentencing," id. at 58. Judge J. Phil Gilbert, speaking on behalf of

the Criminal Law Committee of the Judicial Conference, stated that drug crimes are

"punished too harshly," high loss fraud offenses are punished "too leniently," and they

cannot be compared because they are "apples and oranges." Id. at 56.

Dr. Mark Cohen, Professor of Economics at Vanderbilt University, stated that

"drug offenses are broke so they need to be fixed," but that there was no "evidence that

fraud is broke," and summarized research presented at the symposium demonstrating

that increasing sentences for fraud would not serve the purpose of deterrence. Id. at

65-66, 69.

Nonetheless, as revealed by the question posed by the Commission and its

reference to "penalty levels for offenses of similar seriousness sentenced under other

guidelines," USSG, App. C, Amend. 617 (Nov. 1, 2001), the Commission ratcheted up

the guidelines based on the guidelines for drug offenses.  This alone demonstrates that

the increase was unsound, for the drug guidelines themselves were not based on

empirical data or national experience. *See Gall, 552 U.S. at 46 n.2; Kimbrough, 552*

*U.S. at 96*.  Instead, they were designed to be "proportional" to statutory mandatory

10

minimums, see USSG § 2D1.1 comment. (backg'd) (1987), lack any empirical basis, and dramatically increased sentences for drug offenses "far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." Fifteen Year Report at 49. Moreover, contrary to the Commission's vague assertion, the comments the Commission actually received did not indicate that the Commission should increase fraud penalties to approach or match drug penalties.

The explanations offered by the Commission for the two amendments which are thus deficient and inaccurate. In both instances, the Commission amended the guideline not in the exercise of its characteristic institutional role as an independent expert body, but instead based on unsupported signals. The Commission ignored the overwhelming empirical research, discussed at length above and at the Economic Crimes Symposium, demonstrating that increases in sentence severity, as opposed to certainty, have no deterrent value, and it ignored the actual feedback from the district courts. Though the Guidelines explicitly allowed (and still allow) for upward departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," see USSG § 2F1.1 comment. (n.11) (2000), the sentencing courts granted upward departures in only 1.2 percent of cases sentenced under § 2F1.1 in the year 2000, while they granted downward departures in 11.2% of cases and another 19% received departures for substantial assistance. See U.S. Sent'g Comm'n, 2000 Sourcebook of Federal Sentencing Statistics, tbl. 28 (2000); see also Economic Crimes Symposium at 63 (remarks of James Felman, co-chair of the Commission's Practitioner's Advisory Group) (citing similar statistics for fiscal year 1999, and also

pointing out that in fraud cases, judges sentenced at the high end of the applicable guideline range less frequently than average and at the bottom of the range in the majority of cases).

This feedback from judges, the institutional actor best suited to make sentencing determinations, did not support any increase.  The 1989 and 2001 increases in the fraud guideline led to the absurd result that first-time, nonviolent fraud offenders were subject to guideline ranges as high as those imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. Compare USSG § 2B1.1 (offense level 28 for loss over $2.5 million, 2 or more victims, organizer or leader) with USSG § 2D1.1 (offense level 26 for causing a death or serious bodily injury resulting from use of a substance); USSG § 2A2.1(offense level 27 for assault with intent to commit first degree murder); § 2A4.1 (offense level 32 for kidnapping), USSG § 2K1.4 (offense level 24 for arson creating substantial risk of death or serious bodily injury), USSG § 2A1.3 (offense level 29 for voluntary manslaughter).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Gupta, __ F. Supp. 2d __ (SDNY Oct. 24, 2012)* ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [3553(a)] and . . .effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006)* (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]").  The

amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ]

moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger,*

*329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004)*.  Defendants rarely set out to defraud

others of a specific amount of money; rather, the amount of loss is dependent on the

security procedures in place and the point in time when the fraud happens to be

detected. Id.

"Had [the defendant] been caught sooner, he would have stolen less money; had he not
been caught until later, he would surely have stolen more." Id.

In 2003, the base offense level was increased from six to seven for defendants

convicted of an offense with a statutory maximum of 20 years. See USSG App. C,

Amend. 653 (Nov.1,2003).  The Sarbanes-Oxley Act had raised statutory maximums for

most fraud offenses after a "bidding war" in Congress. See Frank O. Bowman III, Pour

Encourager Les Autres?, 1 Ohio State J. Crim. L. 373, 404 (2004).  Thus, the one-level

increase resulted in a 10% increase for most fraud offenders, including Mr. Johnson.

As its stated reason, the Commission pointed to Congress's directive in section

905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to

consider whether the guidelines are "sufficient to deter and punish" certain economic

crimes "in view of the statutory increases in penalties contained in the Act." See USSG

App. C, Amend. 653 (Nov. 1, 2003)(Reason for Amendment).

Having just substantially raised penalties in 2001, the Commission could have

narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley

Act.  That is what all commentators (other than the Department of Justice) advised, and

the The first fraud guideline, § 2F1.1, included two specific offense characteristics in

addition to loss, one with four subparts applicable in the alternative and one that required a floor of 12 levels. See USSG § 2F1.1 (1987).

Presently, § 2B1.1 includes at least eighteen cumulative specific offense characteristics, many with multiple alternatives. See USSG § 2B1.1 (2010). In the initial set of guidelines, if there was "more than minimal planning" and "more than one victim", one 2-level enhancement applied.  Now, being an organizer or leader and "10 or more victims" cumulatively produce a 6-level enhancement.  These factors are "closely correlated" with each other and with loss. See Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker,20 Fed. Sent. R. 167, 170, 2008 WL 2201039, (Feb. 2008). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." Id. "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide.  Any case involving a corporate officer and a multimillion-dollar fraud will empirical evidence showed that across-the board-increases were unnecessary. The Department of Justice, however, placed intense pressure on the Commission to raise sentences for all fraud offenders, privately threatening to go back to Congress for a more specific directive if the Commission did not comply with the Department's wishes.  The Commission initially resisted.

However, nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for both high and low-level fraud offenders, with special attention to the "penalty gap" between fraud and narcotics cases. See Bowman, supra, at 411-32.  Accordingly, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress." See USSG App. C, Amend. 653 (Nov. 1, 2003).  In doing so, the Commission once again ratcheted up the fraud guideline to more closely match the unsound drug guidelines, and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding the seriousness of the offense. See Bowman, supra, at 434. Any case involving a corporate officer and a multimillion dollar loss will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." Id. at 171. See also Samuel W. Buell, Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud, 28 Cardozo L. Rev. 1611, 1648- 49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, At a "Loss" for Justice: Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the

actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission has recognized this problem of "factor creep," in which as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." Fifteen Year Report at 137.  In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders   And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales). . . . The precision is false." See, e.g., Justice Stephen Breyer, Federal Sentencing Guidelines Revisited, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11 (1999).  Since the Commission has not corrected the problem of multiple overlapping enhancements, many courts have recognized that a departure or variance is warranted to avoid it. *See, e.g., United States v. Lauersen, 362 F.3d 160, 164 (2d Cir. 2004)* (subsequently vacated in light of Booker) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *United States v. Parris, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008)* (guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1*); United States v. Adelson, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006)* (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as

16

"represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

In the present case, Mr. Johnson has a guidelines range of 28 with a criminal history category of 0.  This makes his potential sentence from 78 months (6.5 years) to 87 months (7.25 years) per count.  However, under a statutory sentence, he is eligible for probation from 1- 5 years.  Mr. Johnson is asking the Court to place him on 5 years probation.

The main basis for the sentencing range is based upon the loss calculation which adds 18 points to the base guideline.  The guidelines took this into account in its previous version and expressly sanctioned departures from the calculation where the loss overstates the seriousness of the offense. (See U.S.S.G. §2F1.1, app. Note 8(b) (2000) (sanctioning departure "where the loss…significantly understates or overstates the seriousness of the offense".  The 2001 Guidelines contain a similar provision, which broadens the scope of the downward departure ground from situations in which loss alone overstates the seriousness of the offense to situations in which "the offense level determined under this Guideline substantially overstates the seriousness of the offense." U.S.S.G. §2B1.1, app. Note 15(b)(2001).

For purposes of comparison, in the Enron prosecution, the cooperating witnesses were facing guideline ranges from 20 years to life.  The actual sentences for some of those defendants were 6 years for the CFO Andrew Fastow (apx. $23,000.000.00), Enron treasurer Ben Glisan 5 years, (as part of the $30,000.000.00 fraud) Assistant Treasurer Timothy Despain 4 years probation.

The amount of the loss attributable to Mr. Johnson is $2,768,139.00.   This is the amount of money owed to the lending institutions based upon deficiencies after the properties were sold.  The potential guideline sentencing range for Mr. Johnson, based upon this amount, overstates the seriousness of the offenses to which Mr. Johnson has pled guilty.  This in turn justifies a non guideline statutory sentence or a variance to reflect a more accurate punishment for his specific crimes.

## JUSTIFICATION FOR VARIANCE

**1.    History and Characteristics of the Defendant.  18 U.S.C. § 3553(a)(1).**

A review of paragraph 105 of the presentence report illustrates that Mr. Johnson has a college education and is able to hold gainful employment.  He does not appear to have any mental health or substance abuse problems and is not in need of any physical health treatment.  He has no institutional needs.

**2.    The Need to Provide Just Punishment.  18 U.S.C. § 3553(a)(2)(A).**

The sentence the Mr. Johnson is proposing takes into account the nature of the crime and his level of culpability.  For Mr. Johnson, the stigma of having the felony convictions creates the shame and humiliation within his family and his community that is a lifelong punishment.  Having to advise his children of his actions was one of the most difficult tasks he has had to face.  These types of consequences are huge for Mr. Johnson as they will follow him for the remainder of his life.

This Court has the authority to impose a sentence of probation under the United States Sentencing Guidelines and 18 U.S.C.§3553(a).  Accordingly, this Court may depart from the projected guideline range.

18

What *Feeney* took away from district judges, the Supreme Court restored through its holdings in *United States v. Booker*, 453 U.S. 220 (2005), ___ U.S. ___, 128 S.Ct. 558, 76 USLW 4023 (2007) and *Gall v. United States,* 522 U.S. ___, 128 S.Ct. 586, 76 USLW 4009 (2007).[1]  The result is this: apart from whatever sentence is forced via the inflexible guideline calculus endorsed by the government, this Court is now free to substitute a wholly different result via the mandate of 18 U.S.C.§3553(a).

A sentence of probation does not, by necessity, minimize the seriousness of the offense.  As the court noted in *Gall*, [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty, 128. S.Ct. 595*, citing, United States v. Knights*, 534 U.S.112, 119 (2001) (quotations and cumulative citation omitted).  Already, one court's below-guideline sentence for possession of child pornography on grounds far less mitigating than those presented here has survived appellate review.  *United States v. Smith*, Slip Copy, 2008 WL 1816564 (4th Cir., April 22, 2008) *unpublished*.

Probation is not a free ride.

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. §5B1.3. Most probationers are also subject to individual special conditions imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

---

[1] Though it is now absolutely clear that the guidelines are advisory only, the Sentencing Commission has, curiously, declined to acknowledge their reduced status, failing to remove mandatory language or to even add the word Advisory to their title.

*Gall*, 128 S.Ct. *at 595-596.*

Mr. Johnson is asking the Court to follow *United States v. Bennett, supra,* and make a finding that the use of the guidelines in this case would produce a sentence greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a).

Mr. Johnson is requesting the Court consider the alternatives to incarceration and place him on probation.  This will afford him the opportunity to move forward with his life and pay the enormous restitution order that he will be responsible for.  This punishment is sufficient but not greater than necessary to satisfy the purposes of sentencing.

**3.**      **The Need to Afford Adequate Deterrence.  18 U.S.C. § 3553(a)(2)(B).**

**The Need to Protect the Public from Further Crimes.  18 U.S.C. § 3553(a)(2)(C).**

The presentence investigation report that Mr. Johnson is not a danger to the safety of another person or the community and that a sentence to the low end of the guidelines range is recommended to deter Mr. Johnson from future criminal conduct.

There is no indication from any source that Mr. Johnson will be involved in any future criminal conduct.  This case has been in the courts since September of 2011 and the Defendant has not even had a traffic violation.  He is in full compliance with pre-trial services and has appeared for all of his court dates.  There is no need to incarcerate Mr. Johnson to deter him from future criminal conduct.  He fully understands and accepts responsibility for his actions in this case.  His past history shows that he has the ability to work to be able to earn a living and pay restitution.

**4.**      **The Need to Provide Correctional Treatment.  18 U.S.C. § 3553(a)(2)(D).**

Mr. Johnson had not institutional needs.

20

**5.    The Kinds Of Sentences Available; The Advisory Guideline Range;**

**Any Pertinent Policy Statements Issued By The Sentencing Commission;    The**

**Need To Avoid Unwarranted Sentence Disparities; And The Need To  Provide**

**Restitution To Any Victims Of The Offense.18 U.S.C. § 3553      (3)(4)(5)(6)(7)**

These categories tend to overlap. Mr. Johnson incorporates his previous arguments in this motion into this paragraph.   As the probation report points out, the Court can sentence pursuant to statute or the guidelines and policy statements set out by the Sentencing Commission.  Mr. Johnson believes that a sentence to 5 years probation would allow him the time to attempt to commence payment of restitution to the victims.

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." See18 U.S.C. §3553(a)(7); *see also, e.g., United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006)* (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Peterson, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005)* (granting a variance so that defendant could work and pay restitution).

<u>**CONCLUSION**</u>

For the above-stated reasons, Mr. Johnson, respectfully requests a sentence of 5 years of probation.

21

Respectfully submitted this the 14th day of February, 2014.

DAVID L. MILLER, P.C.

s/ David L. Miller
David L. Miller
1404 Larimer Street, #203
Denver, CO 80202
(303) 355-6600 office
(303) 355-6885 fax
dmiller@davidmillerpc.com
Attorney for Defendant Johnson

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2014, I electronically filed the foregoing MOTION FOR NON GUIDELINE STATUTORY SENTENCE with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address and all counsel of record:

Tim R. Neff
Tim.Neff@usdoj.gov

and by US Postal Service to Dale Johnson

DAVID L. MILLER, P.C.

s/ David L. Miller
David L. Miller
1404 Larimer Street, #203
Denver, CO 80202
(303) 355-6600 office
(303) 355-6885 fax
dmiller@davidmillerpc.com
Attorney for Defendant Johnson